UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON


CIVIL ACTION NO. 5:13-CV-27-KKC

SARA ELIZABETH MEYER                                                  PLAINTIFF

vs.                              **OPINION AND ORDER**

ROBERT McBURNEY, et al.                                              DEFENDANTS

* * * * * * * *


      This matter is before the Court on the motions of Defendants Toyota Motor Manufacturing Kentucky, Inc. ("TMMK") and Kelly Services, Inc. ("Kelly") for summary judgment.1  For the reasons discussed below, the motions will be granted.

## I.    BACKGROUND

      Plaintiff Sara Meyer ("Meyer") alleged quid pro quo (Count I) and hostile work environment (Count II) against TMMK under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.  The same allegations against TMMK were raised under the Kentucky Civil Rights Act ("KCRA"), K.R.S.  § 344.040 (Counts III and IV).  Meyer also alleged retaliation or conspiracy to retaliate against TMMK and Kelly under Title VII (Count V) and under the KCRA (Count VI).  In response to the motions for summary judgment, Meyer agreed that all federal claims and the state-law retaliation claims against TMMK should be dismissed.  DE 37 at 1.  The only claims remaining against Kelly are federal and state retaliation claims.  The only claims remaining against TMMK are state-law claims of quid pro quo and hostile work environment.  *Id.*

      Meyer was hired by Kelly on July 29, 2009 and placed in a production position at TMMK as part of the TMMK variable work force [temporary workers].  Meyer Dep. at 23.  Kelly has an

---

All claims against Robert McBurney were dismissed on April 8, 2013.  DE 13.

anti-harassment policy which requires an employee who believes he or she is being subjected to sexual harassment or to offensive conduct of a sexual nature to notify his or her on-site manager immediately. Meyer acknowledged this was the policy. Meyer Dep. 18-20. Kelly maintains on-site supervisors for the variable work force at TMMK to handle their leave, time off, attendance, performance and to conduct investigations. Scott Thompson Dep. at 8-9. Meyer was familiar with Kelly's on-site management personnel. Meyer Dep. at 22. Scott Thompson was Meyer's on-site supervisor in March 2011. Thompson Dep. at 8-9. Thompson's supervisor was Crystal Stewart, who was the person at Kelly authorized to take personnel action in favor of or against Meyer. Stewart Dep. at 40-42.

TMMK has "team leaders" and "group leaders" for its workforce. Team leaders "assist team members with training, daily scheduling and provide coaching on the proper way to perform the various work processes. Team leaders do not assign work or evaluate team members and are not consulted with respect to team member disciplinary issues." DE 35-3 ¶ 6, Affidavit of Cathy Decker. "Group Leaders have authority to assign work, evaluate the team members under their supervision, and are consulted with respect to discipline to be issued to team members they supervise." *Id.* at ¶ 5. TMMK had an Anti-Harassment Policy which strictly prohibited sexual harassment including:

> [U]nwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature where (1) submission to such conduct is made a term or condition of employment; (2) an employment decision (such as promotion or job assignment) is based on acceptance or rejection of such conduct; or (3) such conduct interferes with a team member's work performance or creates an intimidating, hostile or offensive work environment.

DE35-2 at 63; D 557. "Any team member who feels that he/she has been subjected to conduct in violation of this policy or who is aware of any violation, should immediately report it to: Human Resources; Group Leader/Supervisor; Any other member of management; or Call the Ethics and Compliance Helpline...." *Id.* at 66; D559

Meyer began working at TMMK in the rocker panel area of the plastics department. She was transferred January 11, 2010 to plastics bumper injection and on November 1, 2010 to the plastics bumper three assembly. Meyer Dep. 23-26. On February 7, 2011, Robert McBurney joined Meyer's group as a team leader in plastics bumper three assembly. *Id.* at 41. On April 4, 2011, Meyer was transferred to the paint two finish department where she remained until her suspension on September 16, 2011 and her termination three days later. Meyer Dep. 25-26.

On March 21, 2011, Meyer went to Errika Bowman, one of Kelly's on-site managers, and complained about issues with various co-workers, including sexual harassment issues with McBurney. Meyer Dep. at 43-45. One of Meyer's complaints was that Randall Steele, a team leader in another department, friended her on Facebook afterward, began showing her maternity photos from Facebook to co-workers. *Id.* at 53-56. She never actually saw him do this. Rather, she just heard he was. *Id.* at 60-61. She never confronted Steele about this. *Id.* at 61-62. She un-friended him and shut down her Facebook page. *Id.* at 58, 78.

A second complaint was that Rick Saylor, another co-worker, called Meyer a "porn star" on Valentine's Day of 2011. She claims this happened because her hair was in pigtails. That same day, Elizabeth Buffy Bush called her a "whore" because of the pigtails. Meyer did not report any of these incidents to her group leader. *Id.* at 63-66.

Meyer's primary claim against TMMK is based on alleged sexual comments allegedly made by Robert McBurney, a team leader with TMMK, between January and March 2011. DE 37 at 3; Meyer Dep. 84-85, 174. Meyer and McBurney were just work friends from February 2010 until January 2011. *Id.* at 89. Meyer alleges that after January 2011, McBurney made several remarks about her personal appearance. DE 1-1, ¶ 19. He told her he stayed at a hotel in the winter and suggested she come to see him. Meyer Dep. 93-95. He also commented on how her "butt looked in jeans." *Id.* at 95. She did not report this to anyone or tell her husband,

who was also a team leader at TMMK. *Id.* at 96. The first time Meyer complained about McBurney and sexual harassment was March 21, 2011. *Id.* at 46.

Meyer relies most heavily on a conversation with McBurney that she recorded while in his car. DE 37 at 5. The date was March 9 or 10, 2011. Meyer Dep. at 174-175. While McBurney said he found Meyer attractive, the bottom line of the conversation was that he wanted Meyer to quit texting him on his cell phone on weekends, and he said they were both married and would remain "work acquaintances" and nothing more. Meyer testified as follows regarding that recorded conversation:

> Q. During the conversation ... it sounds to me like on two occasions he told you to stop sending him the texts to his cell phone?
> A. Correct.
> * * *
> Q. And do you recall at one point saying, you know, he asked you to, quote, unquote, back off on sending the texts?
> A. Correct.
> Q. And you got the impression from what he was telling you that he wanted you to stop sending the texts?
> A. Correct.
> Q. I think also in the conversation he mentions that at least he recognizes that you and [he] were married to other people. Right?
> A. Correct.
> * * *
> Q. And I believe he recognized that you were happily married in your marriage?
> A. Correct.
> Q. And I believe if I'm listening to it correctly he's sharing with you that he's working on his marriage with his wife?
> A. Correct.
> Q. And you understood that?
> A. Correct.
> Q. [H]e was telling you that when he gets these texts that you're sending him over the weekend that that's disrupting him and interfering with his time with his wife. Is that right?
> A. Correct.
> Q. That's something he told you?
> A. Correct. (Meyer Dep. at 130-31.)

Meyer admitted that the sum of the conversation was that they were going to remain just friends or work acquaintances:

Q.     Did you get the understanding that essentially the conversation you were having with Robert is we've got two adults married to different people. Got a work relationship. And that you guys are just going to remain friends or work acquaintances?

A.     Correct.

Q.     That the sum gist of the overall conversation?

A.     Yes.

Q.     That's how you came away from the conversation?

A.     I came away that he wanted more, but he understood why we could not.

Q.     Okay, And that's because for the things I just said that he had said to you we're married. We're married to other people. You're happily married. He's working on his marriage with his wife and we're just going to be work acquaintances and that is it?

A.     Correct. (Meyer Dep. at 131-32.)

Meyer's recording of this conversation was not provided to TMMK until discovery in this litigation. Meyer did not submit the recording to TMMK at the time she complained or during the investigation of her complaint. While she said her husband provided the recording to TMMK, she testified she learned after August 31, 2011 that he had not and she had "misheard him." *Id.* at 140-44. Meyer also claimed that she told Marques McMurry, on-site management personnel for Kelly, about the recording, but he told her recording was against the rules and not to mention the recording again. *Id.* at 22, 137.

After Meyer complained to Errika Bowman on March 21, 2011, Bowman told her there would be an investigation. *Id.* at 46-47. Meyer was interviewed March 23, 2011 by TMMK personnel. *Id.* at 47-48. Subsequent interviews were conducted with co-workers Rick Saylor, Elizabeth Buggy Bush, Dan Cook, Vicky Stroub, Robert McBurney, Helen Finch and Randall Steele regarding Meyer's allegations. *Id.* at 68. Meyer admitted in her deposition that none of the persons interviewed corroborated her claims. *Id.* at 69. McMurry documented his conversation with Meyer on March 31 that "the investigations team was not able to substantiate her claim of sexual harassment against her T/L Robert McBurney." DE 34-5. When McMurry asked if she would be uncomfortable in the group, she responded she would not be opposed to

moving to another area. McMurry met with her on Friday, April 1, and told her she was moving to a new group effective Monday. *Id.*

On August 23, 2011, Meyer submitted a written complaint to Kelly's on-site supervisor, Scott Thompson, that her prior complaint had not been handled properly. DE 1, ¶ 28; Meyer Dep. 144-45, 182-83; DE 34-6. The new complaint reiterated claims about being called a whore on Valentine's Day and that her maternity photos from Facebook were being circulated. DE 34-6. Meyer raised new claims that there were rumors that a deal was cut with the temporaries such that they would be hired full time if they caught Meyer doing something that warranted her being fired. She claimed she was being stalked by a TMMK employee. *Id.*, CM-ECF p. 5. She wrote that her husband took the recording of McBurney's harassment to TRAC and that she was removed immediately and put in a different shop. *Id.* She said her new team leader found out why she was moved and began gossiping to everyone in her group. Meyer said this team leader talked to the team leaders where Meyer was going to be moved to rally them to tell the assistant manager she was not being punished enough. *Id.* at CM-ECF p. 6.

In the complaint, Meyer continued that one person texted her, beginning with "hey sexy." She said she kept "hearing about content on my phone they were getting a hold of." *Id.* at CM-ECF p. 7. She changed her phone number twice to keep people from getting content on her phone and then talking about the situations on the production line. She said someone knows her location at all times and that she has been stalked for a long time. *Id.* at CM-ECF pp. 7-8.

Meyer was interviewed on August 26, 2011 regarding her complaint. She thought her husband had submitted the recording of the conversation with McBurney to TRAC. Meyer Dep. 202-03. Meyer's husband was interviewed August 31, 2011, and he denied submitting a recording to TRAC or even being asked to do so. DE 34-7. Meyer admits she never gave the recording to anyone at Kelly or TMMK. Meyer Dep. 203-4, 251-52.

Regarding Meyer's claim that team leader Michelle was gossiping about her to the group and saying she had not been punished enough, Meyer listed several people who may have overhead this. *Id.* at 191-93. Meyer admits those people were interviewed, and no one supported her allegations. *Id.* 193-4.

Meyer complained that someone was cloning or hacking her phone. *Id.* at 194-95. She got a new phone and SIM card, but she left it unattended in the break room to charge and believed people had hacked into it and could look at her private texts. *Id.* at 195-97. She asked Verizon to investigate that for her, but they could not find anything of that sort. *Id.* at 197-98. Meyer admitted she had no proof that her phone was cloned. *Id.* at 231. She claimed that she was being stalked because she saw TMMK people outside of work or at various locations. *Id.* at 198-99. She also believed a tracking system was put on her or her car. *Id.* at 199, 231.

TMMK conducted another investigation, and none of Meyer's claims were substantiated by other employees. DE 34-8; Meyer Dep. 207-208. Instead, her co-workers described her as "very disruptive to the Paint Finish Group with her trying to be in everyone's business and her staring making team members uncomfortable and her making constant allegations of someone talking about her, reading her texts, and 'tracking' her outside of work." DE 34-8. Scott Thompson spoke with Meyer on September 13, 2011 and advised that no one could support her claims. He told her that "these type of allegations are taken seriously, have been investigated thoroughly and have taken a great deal of time and effort." DE 34-9. He advised her that "it would be in her 'best interest' to refrain from making complaints regarding rumors, gossip and innuendo, and that any policy violation infractions reported need to be verifiable in order to take appropriate action." *Id.*

On September 13, 2011, Meyer reported to Thompson that her team leader was telling others information from her text messages, particularly that she was planning to go to OSHA if she was not hired full time by TMMK. DE 34-10. When she retrieved her phone from her locker

and showed Thompson, the text message simply said "OSHA" and nothing else.  *Id.*  Meyer admitted having a normal relationship with this team leader and that he treated her like "anybody else on the line."  Meyer Dep. 241-42.  Yet, she insisted that he had access to her text messages and was part of the surveillance of her by co-workers.  *Id.* at 243-44.  Meyer insisted that two of her phones were hacked or cloned, but she had no proof.  *Id.* at 249-251.  Meyer was told that she was being suspended pending an investigation, but would be paid for the rest of the night.  Thompson talked with the co-worker Meyer claimed overheard the OSHA conversation, but he had not heard anything like that.  DE 34-10.  Meyer's assignment at TMMK was ended on September 19, 2011.  Meyer Dep. 222.  She was told she was eligible for other placements with Kelly but was ineligible for placement at TMMK.  *Id.* at 260.

## II.    ANALYSIS

### A.    Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A genuine issue of material fact exists if there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in favor of that party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  *Id.* at 251-52.  The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once the moving party shows that there is an absence of evidence to support the nonmoving party's case, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts."  *Moore v. Phillip Morris Companies, Inc.*, 8 F.3d 335, 340 (6th Cir. 1993).  Conclusory allegations

are not enough to allow a nonmoving party to withstand a motion for summary judgment. *Id.* at 343. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson,* 477 U.S. at 252. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted).

### B.  Claims of Quid Pro Quo and Hostile Work Environment Against Kelly

Kentucky law is clear that the KCRA is to be interpreted "in consonance with Title VII of the Federal Civil Rights Act of 1964." *American General Life & Accident Ins. Co.,* 74 S.W.3d 688, 691 (Ky. 2002). *See also Spees v. James Marine, Inc.*, 617 F.3d 380, 389 (6th Cir. 2010) ("[T]he KCRA is similar to Title VII of the Federal Civil Rights Act and should be interpreted consistently with federal law."). The purpose of the KCRA is "to provide for execution within the states of the policies embodied in the Federal Civil Rights Act of 1964 as amended." KRS 344.020(1)(a).

"To prevail under a sexual harassment claim without showing that the harassment was severe or pervasive, the employee must prove the following: 1) that the employee was a member of a protected class; 2) that the employee was subjected to unwelcomed sexual harassment in the form of sexual advances or requests for sexual favors; 3) that the harassment complained of was on the basis of sex; 4) that the employee's submission to the unwelcomed advances was an express or implied condition for receiving job benefits or that the employee's refusal to submit to the supervisor's sexual demands resulted in a tangible job detriment; and 5) the existence of respondeat superior liability." *Bowman v. Shawnee State University*, 220 F.3d 456, 461 (6th Cir. 2000).

*Vance v. Ball State University,* 133 S. Ct. 2434 (2013), made it clear that there are only a few situations in which an employer is directly liable for an employee's unlawful harassment.

The employer may be held liable "if the employer was negligent with respect to the offensive behavior." *Id.* at 2441. This rule is generally applied "to evaluate employer liability when a co-worker harasses the plaintiff." *Id.* The second set of circumstances where an employer can be liable involve "harassment by a 'supervisor' as opposed to a co-worker." *Id.* at 2441-42. First, an employer is vicariously liable "when a supervisor takes a tangible employment action," for example "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 2442, quoting *Ellerth*, 524 U.S. at 762.

"Quid pro quo harassment occurs only where an individual is in a position to offer tangible job benefits in exchange for sexual favors or, alternatively, threaten job injury for a failure to submit. Therefore, the party engaged in quid pro quo harassment is almost always, by definition, a supervisor." *Hartleip v. McNeilab, Inc.*, 83 F.3d 767, 775 (6th Cir. 1996) (quotations and citations omitted).

Meyer's claim of quid pro quo is based upon the alleged advances of Robert McBurney. This claim fails, however, because McBurney worked for TMMK and was not Meyer's supervisor. He had no authority to offer, take or threaten any job action for Meyer as a quid pro quo for a response to sexual advances. *See American General*, 74 S.W.3d at 692 describing quid pro quo claim. Meyer admits she was an employee of Kelly Services, not TMMK. Meyer Dep. 22-23. Only Kelly's on-site management personnel, such as Crystal Stewart, qualified as Meyer's supervisor because only they could take a tangible job action, such as hiring, firing or suspending her. *Id.* at 22, 138; Stewart Dep. at 40-42.

Meyer argues in response to Toyota's motion for summary judgment that McBurney had a very special status in that he might be able to influence whether Meyer would be hired as a permanent employee. DE 37 at 13-14, 19-21. The same argument could be applied to almost any fellow employee, however, and such an exception would swallow the rule. Meyer provides

no legal support for this argument. Moreover, the *Vance* court soundly rejected such a claim. "There is no hint in either decision that the Court had in mind two categories of supervisors: first, those who have such authority and, second, those who, although lacking this power, nevertheless have the ability to direct a co-worker's labor to some ill-defined degree." *Vance*, 133 S.Ct. at 2443. "The ability to direct another employee's tasks is simply not sufficient. Employees with such powers are certainly capable of creating intolerable work environments ... but so are many other co-workers. Negligence provides the better framework for evaluating an employer's liability when a harassing employee lacks the power to take tangible employment actions." *Id.* at 2448.

Also without any supporting legal authority, Meyer argues that this case involves a "joint employer," which should be treated as an exception to the supervisor requirement. DE 37 at 20-21. The Supreme Court's answer in *Vance* that negligence is the better framework when the employee does not have power to take tangible employment actions encompasses all other circumstances. *Vance*, 131 S. Ct. at 2448. There is a "unitary category of supervisors, *i.e.,* those employees with the authority to make tangible employment decisions." *Id.* at 2443. Meyer has failed to show that McBurney had authority to make tangible employment decisions with respect to her.

Meyer argues that Kentucky has not adopted the *Vance* definition of a supervisor and that this Court must predict what construction a Kentucky court would apply. DE 37 at 23. Kentucky's stated purpose for the KCRA is "to provide for execution within the states of the policies embodied in the Federal Civil Rights Act of 1964 as amended." KRS 344.020(1)(a). The KCRA is to be interpreted "in consonance with Title VII of the Federal Civil Rights Act of 1964." *American General Life & Accident Ins. Co.,* 74 S.W.3d 688, 691 (Ky., 2002). Accordingly, this Court predicts that Kentucky would adopt the definition of a supervisor set forth in *Vance.*

11

Meyer's claim also fails because she cannot establish any casual connection between the alleged harassment and any tangible employment action. The termination of Meyer's assignment with TMMK in September 2011 was made by Kelly, not TMMK. Meyer admitted that McBurney's harassment ended when she made her complaint in March 2011. Her transfer to another department was without impact on her pay or benefits. Meyer Dep. 182.

Meyer's hostile work environment claim is likewise without legal merit. The underlying factual allegations are that two co-workers called her a "whore" and a "porn star" on Valentine's Day when she wore her hair in pig tails, a male co-worker friended her on Facebook and then showed her maternity photo to other workers, and McBurney commented on occasion that she "looked good," "looked sexy today" or was "killing him" today. Meyer Dep. 53-65. Meyer admits that, following the recorded conversation on March 9 or 10, McBurney made no other comments that Meyer regarded as sexually harassing. *Id.* at 175, 181. At no time did he touch her inappropriately or force her to do anything against her will. *Id.* at 232.

A "hostile work environment" requires a plaintiff to show "that the work environment was so pervaded by discrimination that the terms and conditions of employment were altered." *Vance*, 133 S.Ct. at 2441. "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22 (1993). Title VII is not "a general civility code for the American workplace." *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 80 (1998). "A recurring point in Supreme Court cases is that 'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Id.* at 82. Among the factors that may be considered are "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere

offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

In *Clark v. United Parcel Service, Inc.*, 400 F.3d 341 (6th Cir. 2005), the court held there was no hostile work environment when a co-worker told vulgar jokes, twice placed his vibrating pager on the victim's thigh as he passed her in the hall, and pulled at her overalls after she told him she was wearing a thong. These incidents occurred over two and a half years. *Id.* at 351. The *Clark* court also noted that in *Stacy v. Shoney's, Inc.*, No. 97-5393, 1998 WL 165139 at *1-3 (6th Cir. 1998), there was no hostile work environment even though a male supervisor over a two month period continuously made sexually suggestive comments about the female plaintiff's appearance, touched her breast as he removed and replaced a pen from her shirt pocket, leered at her, and told her that if he had someone like her, he would never let her leave the house. *Clark*, 400 F.3d at 352.

Other Sixth Circuit cases in which the work environment was not objectively hostile as a matter of law include *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 790 (6th Cir. 2000) (involving several dirty jokes, a sexual advance, calling plaintiff "hot lips," and commenting about her clothing); *Bowman v. Shawnee State University*, 220 F.3d 456, 464 (6th Cir. 2000) (Supervisor rubbed Bowman's shoulder for one to two seconds in late 1991, grabbed his buttocks at a 1992 Christmas party, invited him to try out the whirlpool with her in the spring of 1994, invited him to enjoy himself in her swimming pool in the summer of 1994, and shoved him in the chest during a meeting in her office in 1995.); and *Burnett v. Tyco Corp.*, 203 F.3d 980, 981, 984-5 (6th Cir. 2000) (Over a six-month period, Personnel Manager put a pack of cigarettes inside Burnett's tank top and brassiere strap while telling a story about a woman he had recently seen; later he made vulgar remarks about Burnett's virginity and about being aroused). Meyer's allegations, by comparison, are even less severe and do not raise a genuine issue of material fact regarding an objectively hostile environment. Here, unlike *Clark*, *Stacy,*

13

*Bowman* and *Burnett,* there is no physical contact at all, merely offensive utterances. The incidents were isolated and infrequent. While Meyer lists multiple comments by McBurney [DE 1-1 at ¶ 21], they were made during one conversation in which he told Meyer that she should quit texting him on weekends and that they would be just friends or work acquaintances since they were both married. She understood that was what he was telling her. Meyer Dep. at 130-132. With respect to evidence of an unreasonable interference with her work performance, Meyer herself says there is no evidence of "below-average work capacity prior to her termination." DE 37 at 27.

Meyer further argues that TMMK's negligence supports her claim, even if McBurney legally is only a co-worker. DE 37 at 21-24. She states she "does not rely upon Toyota's actions following her formal complaint because they are not within the scope of the unlawful actions alleged by her." *Id.* at 23. She admits that "McBurney's conduct stopped following [her] complaint." *Id.* at n. 61. Thus, she concedes that TMMK acted promptly and appropriately once she made a complaint. She argues, instead, that there is a "genuine issue of material fact ... as to whether Toyota acted reasonably in trying to prevent sexual harassment in its workplace." Id. at 22. Meyer acknowledges "open door" and "zero tolerance" policies, but claims TMMK was negligent because it required some corroboration of a complaint before taking disciplinary action against an employee. *Id.* at 7, 22. Meyer seems to argue that an employer is negligent unless it presumes a co-worker is guilty following a bare allegation. The type of employer conduct that the Supreme Court regards as negligence includes evidence "that an employer did not monitor the workplace, failed to respond to complaints, failed to provide a system for registering complaints, or effectively discouraged complaints from being filed." *Vance*, 133 S. Ct. at 2453. Meyer has no legal support for her contention that requiring something minimally more than a bare accusation rises to that level of employer negligence.

Additionally, Bergin Tuttle of TMMK Human Resources testified that when a complaint is of the "he said/she said" type, it is regarded as unsubstantiated. Nonetheless, in these circumstances, the normal procedure is to sit down with the accused, review the sexual harassment policy with them, tell them to stay away from the complainant, and to make it clear that the policy is taken very seriously. Tuttle Dep. 34-35. This procedure is unquestionably aimed at preventing harassment from taking place, rather than discouraging complaints.

When all facts and inferences are viewed in the light most favorable to Meyer, she still fails to make a prima facie case of sexual harassment as a matter of law. TMMK is entitled to summary judgment on Meyer's allegations of sexual harassment.

### C.    Retaliation Claims Against Kelly

Meyer argues that Kelly terminated her in retaliation for her complaints of sexual harassment. DE 37 at 24-31. To make a prima facie case of retaliation, Meyer must show that (1) she engaged in protected activity; (2) Kelly knew that Meyer exercised her civil rights; (3) Kelly took adverse employment action against Meyer; and (4) there was a causal connection between Meyer's protected activity and the adverse employment action. *Wasek v. Arrow Energy Services, Inc.* 682 F.3d 463, 468-69 (6th Cir. 2012). "Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e-2(m). This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. ___, 133 S.Ct. 2517, 2534 (2013). In other words, Meyer must show that she would not have been terminated absent her complaint of sexual harassment.

For purposes of its summary judgment motion, Kelly assumes that Meyer could satisfy the first three elements of her retaliation claim. DE 34 at 18. Kelly moves for summary judgment on the ground that Meyer cannot establish the fourth element of a prima facie case –

but for causation. Meyer contends her termination for "inappropriate behavior" was based solely on her "making complaints that could not be proven true." DE 37 at 25. She argues that her August 23, 2011 complaint to Kelly "included protected activity" in that it objected to TMMK's handling of her complaint against McBurney. She contends her termination was for filing this unsubstantiated complaint and that this is "direct evidence" of retaliation. DE 37 at 25.

One difficulty with Meyer's argument is that she conflates TMMK and Kelly and treats them as one employer. McBurney was a TMMK employee. Meyer's March complaint about sexual harassment by McBurney was investigated by TMMK and resolved by TMMK. Meyer Dep. 47-48, 68-69; DE 34-5. The uncontradicted evidence is that Kelly personnel played no role in TMMK's decision-making process. Thompson Dep. at 29-30; Stewart Dep. 22-23. TMMK also investigated Meyer's August 23 complaints and determined they were unsubstantiated. DE 34-8; Meyer Dep. 207-08. Kelly cannot be held liable for TMMK's decision that Meyer's claims were unsubstantiated. Nor can Kelly be held liable for TMMK's investigation and handling of her claims or its decision that there was no reason to reopen or reconsider her first claim.

The second flaw in Meyer's argument is that she interprets Kelly's term of "inappropriate behavior" to mean seeking a reopening of her sexual harassment complaint. Instead, Stewart's testimony was that she was "stunned" by Meyer's claims of being stalked, that co-workers were cloning her SIM cards, that people were running her off the road, and things of that nature. Stewart Dep. 31-32. Stewart said "we wanted to make sure she was focusing on her work." *Id.* at 39. Meyer was told that Kelly supports her in any investigation of a harassment claim, but was concerned about "allegations outside of harassment, as far as cloning SIM cards, being stalked at work, et cetera...." Stewart Dep. 38-39. On September 13, Meyer again complained to Thompson that her team leader had access to her text messages and was part of the surveillance of her by co-workers. Meyer Dep. 243-44. She insisted her phones were hacked

or cloned, but she had no proof.  *Id.* at 249-51.  Thompson discussed the matter with Stewart, and Stewart made the decision that Meyer would be suspended pending investigation.  Stewart Dep. 40-43.  The investigation into Meyer's September complaint found no corroboration of her claims, but revealed instead that Meyer was "disruptive," "driv[ing] everybody crazy," and "making team members uncomfortable."  DE 34-8.  Her TMMK group leader was concerned about the amount of disruption.  Stewart Dep. 45.  Thompson and Stewart discussed the matter, and Stewart decided Meyer should be terminated for "unacceptable behavior."  *Id.* 45-47.

Meyer has no "direct evidence" of a discriminatory motive on the part of Kelly.  Direct evidence "must establish not only that the plaintiff's employer was predisposed to discriminate on the basis of [sex], but also that the employer acted on that predisposition."  *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004) (quoting *Hein v. All America Plywood Co.*, 232 F.3d 482, 488 (6th Cir. 2000).  "[C]omments made by individuals who are not involved in the decision-making process regarding the plaintiff's employment do not constitute direct evidence of discrimination."  *DiCarlo*, 358 F.3d at 416, quoting *Carter v. University of Toledo*, 349 F.3d 269, 273 (6th Cir. 2003).  "Although this type of direct evidence is rare, when it does exist, it will typically consist of written or oral statements by the decision-maker who was responsible for the adverse action."  *Charalambakis v. Asbury College*, ___ S.W.3d ___, 2014 WL 346068 at *7 (Ky. Ct. App. 2014) (rehearing denied March 25, 2014).  "Direct evidence of retaliation 'would "entail something akin to an admission" by [the decision maker] that she had a retaliatory motive.'"  *Id.*, citation omitted.

In *DiCarlo*, Bailey had decision-making authority and was involved in the decision to terminate DiCarlo three weeks after Bailey called him a "dirty wop" and complained there were too many "dirty wops" working at the postal facility.  *DiCarlo*, 358 F.3d at 416-17.  The court held these remarks were direct evidence of discrimination based on national origin.  *Id.*

In the present case, Kelly's Crystal Stewart made the decision to suspend Meyer.  Stewart Dep. at 40.  Kelly's Scott Thompson conducted the investigation into Meyer's

September claims, and Stewart made the decision to terminate her. Stewart Dep. 43-47. Thompson was not aware of Meyer's March sexual harassment complaint or its outcome when he received her August 23, 2011 complaint. Thompson Dep. 33. Meyer has no direct evidence of discriminatory comments by Stewart or even Thompson. There is no evidence that "inappropriate behavior" related to her complaint of sexual harassment. To the contrary, Thompson said the decision to suspend Meyer had nothing to do with any complaints she made about sexual harassment. Thompson Dep. 56-57 Accordingly, Meyer's argument regarding direct evidence is without merit.

Meyer's retaliation claim against Kelly fails even under a circumstantial evidence standard. Meyer acknowledges that the causation standard requires her to show that "but for" her protected activity, no adverse employment action would have been taken. She argues that "temporal proximity alone can be sufficient to give rise to an inference of causation under Title VII retaliation claims." DE 37 at 26. The case on which she relies, *Clark County School Dist. v. Breeden*, 532 U.S. 268, 272 (2001), does hold that temporal proximity alone is sufficient. It merely cites two circuits that say temporal proximity may be sufficient for a prima facie case when it is "very close." *Id.* at 273. None of the three cases cited in *Breeden* held that temporal proximity alone was sufficient. *See O'Neal v. Ferguson Const. Co.,* 237Ff.3d 1248, 1253 (10th Cir. 2001) (plaintiff provided other evidence); *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (three-month period insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (four-month period insufficient).

The law in the sixth Circuit was set forth in *Spengler v. Worthington Cylinders*, 615 F.3d 481 (6th Cir. 2010), as follows:

> Closeness in time is one indicator of causal connection, but temporal proximity standing alone is not enough to establish a causal connection for a retaliation claim. Nonetheless, there are circumstances in which temporal proximity, when combined with other evidence of retaliatory conduct, is enough to establish a

causal connection, such as when the plaintiff can "show that he was treated differently from other employees."

*Id.* at 494, quoting *Tuttle v. Metro. Government of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007). *See also Riddle v. First Tennessee Bank, N.A.*, 497 F. App'x 588, 596 (6th Cir. 2012) (four months proximity not sufficient). Here, Meyer's complaint of sexual harassment to TMMK was March 21, 2011. She was not terminated until September 19, 2011, six months later. She admitted any sexual harassment stopped after the March recorded conversation. Meyer Dep. 175, 181. Meyer's complaints to Kelly in August and September 2011 were that co-workers were stalking her, cloning her phone, and running her off the road. These complaints had nothing to do with discrimination on the basis of sex. While Meyer sought to reopen her complaint against TMMK because she disagreed with the outcome, she did not complain of discrimination in TMMK's handling of the complaint. Accordingly, temporal proximity here will not support a causal connection for Meyer's retaliation claim.

Meyer argues there is "other evidence of retaliatory conduct" in that her job performance was good and there were no reviews or reprimands for below average work. DE 37 at 27. Evidence of good job performance does not support causation when Meyer's termination was based on inappropriate behavior, which was unrelated to her ability to perform her job. She was disrupting the performance of her co-workers and driving them crazy, no matter how well she may have done her job. As Meyer is unable to establish that she would not have been terminated "but-for" her complaint of sexual harassment, she fails to make out a prima facie case of retaliation. Accordingly, Kelly's motion for summary judgment should be granted.

Meyer argues, alternatively, that the proffered reason for her termination was a pretext, as evidenced by the fact that the action taken (termination) was not warranted by the conduct involved (disruption of the workforce). A plaintiff arguing pretext has the burden of persuasion "to demonstrate that Defendants' proffered reasons for expelling him were pretext." *Barnhart v.*

*Pickrel, Schaeffer & Ebeling Co., L.P.A.*, 12 F.3d 1382, 1389 (6th Cir. 1993); see also *Webb v. Kentucky State University*, 468 F. App'x 515, 524 (6th Cir. 2012) (burden of production shifts back to the plaintiff to show … pretext). Pretext can be shown in three ways: "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Romans v. Michigan Dept. of Human Services*, 668 F.3d 826, 839 (6th Cir. 2012). Meyer argues she can establish pretext under the third category in that the proffered reason was insufficient to support termination of her assignment. "The third showing … ordinarily consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 396 (6th Cir. 2008).

First, Meyer was an "at will" employee who could be discharged for any reason, so long as it was not discriminatory, nor in violation of public policy. DE 34-2 at CM/ECF p. 5. *Nelson Steel Corp. v. McDaniel*, 898 S.W.2d 66, 69 (Ky. 1995). Second, Meyer does not offer any evidence regarding similarly situated employees who were not terminated. Plaintiff suggests that showing disparate treatment is not the only means to establish pretext, but she offers no alternative recognized by the courts. Her allegations also continue to rely on her "redefinition" of the inappropriate behavior on which her termination was based. The evidence is that she was disruptive in the workplace and made her co-workers uncomfortable. Plaintiff fails to meet her burden to show that such behavior was insufficient to motivate her termination.

III.     **CONCLUSION**

**IT IS ORDERED** that the summary judgment motions of Kelly Services [DE 34] and Toyota Manufacturing [DE 35] are **GRANTED**. Contemporaneously with this Opinion and Order, Judgment shall be entered in favor of Kelly Services and Toyota Manufacturing.

This June 4, 2014.

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY